Michael F. MONSCHEIN, Appellant–Respondent,

v.

Letha Harter LaLONDE, Appellee–Petitioner.

No. 49A05–9803–CV–171.

Court of Appeals of Indiana.

Nov. 30, 1998.

David A. Clase, Harper & Clase, Indianapolis, for Appellant–Respondent.

Michael J. Donahoe, Epstein & Frisch, Indianapolis, for Appellee–Petitioner.

SHARPNACK, Chief Judge.

Michael Monschein ("Father") appeals the judgment of the trial court granting visitation of his daughters to the children's grandmother, Letha LaLonde ("Grandmother"). Father raises three issues, which we restate as follows:

1) whether the grandparent visitation statute is unconstitutional on its face or as applied in this case;

2) whether Father is a "stepparent" under the grandparent visitation statute such that the trial court had jurisdiction over the case; and

3) whether the trial court's findings support its judgment granting visitation to Grandmother.

We affirm.

The facts relevant to this appeal follow. In 1990, Shar Harter ("Mother") met Father. At the time she met Father, she was already pregnant with C.M., who was subsequently born in March of 1991. On November 1, 1991, Mother and Father married. In November of 1992, Mother gave birth to L.M., who was the natural daughter of Father.

On February 27, 1994, Mother died from injuries sustained in a car accident. On March 10, 1994, a Colorado court granted permanent custody of both children to Father, despite Grandmother's opposition. Following this custody order, Grandmother made several, ultimately unsuccessful, attempts to gain custody in both Louisiana and Indiana courts.

On September 12, 1996, Father adopted C.M. On September 13, 1996, Grandmother filed a petition for visitation in Marion Coun-

ty. Following hearings on the petition, the trial court granted Grandmother visitation. Thereafter, Father filed a motion to correct error, a motion to dismiss due to lack of subject matter jurisdiction, and a motion for order of stay pending ruling on motion to correct error. The trial court denied these motions as well as a motion by Grandmother to clarify the visitation order. Additional facts will be provided as needed for discussion.

### I.

First, we address Father's assertion that the grandparent visitation statute is unconstitutional both on its face and as applied under the circumstances of this case. However, Grandmother contends that Father has waived appellate review of this issue by failing to properly raise it below.

A party may only obtain judicial review of issues that were properly raised to the trial court. *Franklin Bank & Trust Co. v. Mithoefer*, 563 N.E.2d 551, 553 (Ind.1990). This general rule also applies to the constitutionality of a statute. *See Alwood v. Davis*, 411 N.E.2d 759, 761 (Ind.Ct.App.1980) (holding that the constitutionality of the statute limiting malpractice actions, as applied to a particular class of patients, could not be challenged on appeal because it was not raised nor argued at the trial level).

In responding to Grandmother's assertion that he has waived this argument, Father directs us to portions of the record where he alleges that he raised this issue. However, these portions of the record reveal only a dialogue between Father and his attorney about what decisions he makes for his children. The only statements that even hint at a constitutional argument are the following:

"Q. Are you asking the Court essentially then, to recognize your authority as a parent in this regard and to essentially ... if anything, if nothing else to give you the benefit of the doubt, given the evidence we're [sic] heard about what's happened the last 3 years in making this call?

A. I think I deserve that right. Everybody, you know, everybody has a chance to raise their kids and that's what I'm asking for, a chance to raise my kids."

Record, p. 986.

To preserve a constitutional argument for appeal, the party must at least cite to the portion of the constitution allegedly offended. *Saloom v. Holder*, 158 Ind.App. 177, 183, 304 N.E.2d 217, 221 (1973) (holding that "[t]hrough the years Indiana courts have consistently held that a constitutional question is not properly raised on appeal if the trial court was not apprised of specific constitutional provisions upon which a party relies in asserting that legislation is unconstitutional."), *reh'g denied*. Here, Father not only failed to notify the trial court of the relevant constitutional provision, but failed to even use the word "constitutional." Therefore, we conclude that Father failed to properly raise these constitutional questions to the trial court and, as a result, has waived our review of this issue. *See Franklin*, 563 N.E.2d at 553.

### II.

Father next contends that he is not a "stepparent" under former Ind.Code § 31–1–11.7–2 [1] and, therefore, the trial court was without authority to grant visitation to Grandmother. Specifically, he contends that the definition of stepparent is "the mother or father of a child born during a previous marriage of the other parent and hence, not the natural parent of such child." Appellant's brief, p. 34 (citing BLACK'S LAW DICTIO-

---

1. Former I.C. § 31–1–11.7–2 provided, in relevant part, as follows:
 "(a) A child's grandparent may seek visitation rights if:
 (1) the child's parent is deceased;
 (2) the marriage of the child's parents has been dissolved in Indiana; or
 (3) the child was born out of wedlock.

 * * * * *

 (c) Visitation rights provided for in subsection (a) or (b), survive the adoption of the child by any of the following:
 (1) A stepparent.
 (2) A person who is biologically related to the child as a grandparent, sibling, aunt, uncle, niece, or nephew."

NARY 1414 (6th ed. 1990)). Under this definition, he argues that he is not a stepparent for two reasons. He first maintains that because Mother was never married to C.M.'s father, C.M. was not "born during a previous marriage." *Id.* Second, he contends that even if he was a stepparent while Mother was alive, he was no longer a stepparent after her death but instead merely a widower.

■ Before we reach the merits of his argument, we must address Grandmother's contention that Father has waived this challenge because he failed to raise it to the trial court. *See Franklin,* 563 N.E.2d at 553. Father responds to the issue of waiver by asserting that this issue involves the trial court's subject matter jurisdiction, which is not subject to waiver. *See Wildwood Park Community Ass'n v. Fort Wayne City Plan Comm'n,* 182 Ind.App. 578, 396 N.E.2d 678, 681 (Ind.Ct.App.1979). However, we conclude that Father has confused the power of the trial court to determine whether or not he is a stepparent in this case with the trial court's power to determine any issue or case under the statute. The determination of whether Father is a stepparent affects that trial court's statutory authority to grant visitation, not the trial court's power to determine the merits of cases falling within the class of grandparent visitation actions. *See Farley v. Farley,* 157 Ind.App. 385, 398, 300 N.E.2d 375, 383 (1973) (holding that "[the circuit court] has the power, i.e., subject matter jurisdiction, to act in the 'class of actions'—divorce actions—within which a particular case falls. The expiration of the time during which the court can amend a judgment does not deprive the court of its power to act in all divorce cases but only its power to act in the particular case."). As the issue of whether Father is a stepparent does not affect the subject matter jurisdiction of the trial court, we are inclined to waive his contention for failure to raise the issue below. *See Wildwood,* 396 N.E.2d at 681.

■ Waiver notwithstanding, we reject Father's hypertechnical definition of "stepparent." We first address Father's assertion that he is not a stepparent because C.M. was not born during a previous marriage. This

limited definition has been specifically rejected in *Sightes v. Barker,* 684 N.E.2d 224, 228 (Ind.Ct.App.1997), *trans. denied.* In *Sightes,* we concluded that to define stepparent in such a narrow manner would result in a denial of the legislature's clear intent to preserve the relationship between a grandchild and grandparent after the death of the natural parent. Our reasoning in *Sightes* was as follows:

> "[T]he strong policy for preserving the relationship between the grandparent and child after the marriage of the parent still exists regardless of whether the child was born out of wedlock or was born of a previous marriage. Consequently, there is no strong policy reason for interpreting the statute to mean that visitation survives the adoption by a 'stepparent' only where the child was born of a previous marriage. The result of that interpretation would be to punish a child by cutting off the child's visitation with a grandparent when the child's parent marries merely because the child was not born of a marriage."

*Sightes,* 684 N.E.2d at 228.

Despite this holding directly on point, Father states that *Sightes* is "not good law on the definition of 'stepparent.'" Appellant's brief, p. 33. For support of his definition, he cites to *Thornburg v. American Strawboard Co.,* 141 Ind. 443, 40 N.E. 1062 (1895). However, *Thornburg* involved a statute authorizing a father to sue for wrongful death of a child. The supreme court held that because the statute used the term "father" rather than "stepfather," a stepfather, regardless of how the term was defined, could not maintain such an action. *Id.* at 446, 40 N.E. at 1063. Although the court did note that "strictly speaking, ... a man who marries the mother of a bastard child does not become the stepfather of such child," the definition of stepfather was not directly determinative to the court's holding in the case. *Id.* at 445, 40 N.E. at 1063. As such, we conclude that the statement was dicta and is not binding upon us. Furthermore, the supreme court also noted an alternative definition from Wharton's Law Dictionary defining a stepfather as "[t]he husband of one's mother who is not one's father." *Id.* at 446, 40 N.E. at 1063.

Although Father cites *Thornburg* as supportive of his position that he is not a stepfather, on the contrary, Father would clearly qualify as a stepfather under this second definition recognized by *Thornburg*.

Finally, as *Thornburg* dealt with wrongful death actions, we do not find it to be instructive in the context of grandparent visitation. In conclusion, because this court has already specifically rejected Father's first limitation on the definition of a stepparent in the application of the grandparent visitation statute, we conclude that the fact that C.M. was born out of wedlock does not preclude the trial court's determination that he was C.M.'s stepparent. *See Sightes*, 684 N.E.2d at 228.

We now turn to Father's second assertion. He maintains that even if he was a stepparent while Mother was living, after her death, his status of stepparent was converted to widower. As with his first limitation on the definition of stepparent, this second limitation proposed by Father would also operate to deny a child the opportunity to maintain a relationship with a grandparent merely because the child has suffered the loss of a natural parent prior to the stepparent's adoption of the child.

 As in *Sightes*, we now conclude that there is no strong policy reason for interpreting the statute to mean that visitation survives the adoption by a "stepparent" only where the adoption occurred after the death of the natural parent. Furthermore, aside from citation to Black's Law Dictionary, Father cites no authority for his suggestion that one is no longer a stepparent after the death of the natural parent.[2] Additionally, we find it wholly inconsistent for Father on one hand to seek custody of C.M. after Mother's death and on the other to assert that he is no longer her stepparent during this same time period. Therefore, we hold, that for the purposes of the grandparent visitation statute, grandparent visitation rights survive the adoption by a stepparent where the adoption occurs after the death of the natural parent.

Having rejected Father's attempts to limit the definition of a stepparent, we conclude that, for the purposes of the grandparents visitation statute, Father was C.M.'s stepfather prior to his adoption of her. Consequently, the trial court had the authority under the statute to grant visitation to Grandmother. *See* I.C. § 31–1–11.7–2.

### III.

 Finally, we address Father's argument that the trial court's findings of fact do not support its judgment granting Grandmother visitation. When a trial court has entered special findings of fact and conclusions thereon, we may affirm the judgment on any legal basis provided the affirmance is consistent with all of the trial court's findings of fact and reasonable inferences drawn therefrom, particularly where both parties have briefed the alternative dispositive theory on appeal. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923–924 (Ind.1998). In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Vanderburgh County Bd. of Comm'rs v. Rittenhouse*, 575 N.E.2d 663, 665 (Ind.Ct.App.1991). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind.Ct.App. 1991), *reh'g denied, trans. denied.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Id.* The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions entered on the findings. *Id.*

Father does not challenge any of the trial court's findings of fact. Rather, he asserts that the trial court's numerous find-

---

**2.** We have previously held that, following death of a natural parent, a stepparent may be granted visitation where there is a custodial and parental relationship between the child and the stepparent and where visitation with the stepparent would be in the best interest of the child. *In re, Custody of Banning*, 541 N.E.2d 283, 284 (Ind.Ct.App. 1989). Such a holding supports the idea that the relationship of stepparent does not necessarily vanish upon the death of the natural parent.

ings regarding Grandmother's misconduct in seeking custody of his daughters weigh against the trial court's judgment granting unsupervised visitation in Louisiana. Father contends that the trial court abused its discretion in granting visitation given its extensive findings regarding Grandmother's "aggressive pattern ... to mislead, deceive and manipulate the courts for the purpose of obtaining sole custody of [C.M.]," her "involvement of the local media ... in airing the dispute between [Grandmother] and Father," Grandmother's "inability to control her vitriol toward Father ...," and "the existence of intense family conflict and discord...." Record, pp. 227, 228, 230. He maintains that, given her history of deceiving the courts, unsupervised visitation in Louisiana carries the risk that Grandmother will again attempt to obtain custody of C.M.

While we do find the trial court's extensive findings on Grandmother's reprehensible disregard for the judicial process disturbing, we are restrained by our standard of review from giving these findings more weight than did the trial court in making its decision. We may only reverse the trial court if the judgment is clearly erroneous and unsupported by its findings and conclusions. *See DeHaan*, 572 N.E.2d at 1320. As a result, we must consider those findings that support the trial court's decision to grant visitation.

▬▬ The findings and conclusions that support the trial court's judgment include the following:

"40. The LaLondes have taken certain actions which would support their stated intention not to use the legal system to again deprive Father of his custodial relationship with the girls. On May 22, 1997, the LaLondes, through their attorney ... caused to be filed a 'Motion to Recall, Set Aside and Void Arrest Warrant' in the 16th Judicial District Court for the St. Martin parish in the state of Louisiana. As a result, a judge of that court ... in fact recalled and set aside the previously issued arrest warrant and voided it ab initio....

Also on July 28, 1997, [Grandmother] filed an Affidavit Conceding Indiana Jurisdiction [in] this Court and the Court in Louisiana stating, inter alia, that she has dismissed the custody proceeding in Louisiana, that she acknowledges and agrees that Indiana shall retain 'exclusive and continuing jurisdiction' over these child custody and related matters.

41. During her testimony, [Grandmother] acknowledged that, having exhausted all of her appellate rights, together with the adoption of [C.M.] by Michael, custody was no longer an issue, that she had no desire to continue litigating the issue of custody or jurisdiction, and that she was simply seeking the right to have reasonable visitation with her two granddaughters.

42. [Grandmother] further testified that she had been married to Boyd LaLonde for over ten years, and the marriage was a healthy and stable one. Dr. Boyd LaLonde is a practicing dentist and has maintained a private practice in Breaux Bridge, Louisiana for the past 30 years.

43. Both Boyd and [Grandmother] testified that, in addition to [C.M. and L.M.], they have four other grandchildren, two of whom reside near them in Louisiana and two of whom currently reside with [Grandmother's] son, Fred, near Ft. Campbell, Kentucky, where Fred is stationed in the United States Army.

44. The LaLondes enjoy a healthy relationship with the four other grandchildren and have frequent visitation, unsupervised and in their home, sometimes for a duration of 14 days. The LaLondes are purchasing their residence in Breaux Bridge, Louisiana and both estimate the fair market value of that residence to be approximately $115,000.00. This is a three-bedroom home located in a neighborhood comprised of homes of comparable value.

45. [C.M.] lived with Dr. [LaLonde] and [Grandmother] for a great deal of time, before and during Shar's marriage to Michael, after Shar's death and including the continuous period between August, 1994 and February, 1996.

46. During this period of time, the LaLondes established a strong bond with [C.M.]. They enjoyed the normal recreational activities that any parent or grandparent would enjoy with a child or grandchild. The LaLondes had [C.M.] enrolled in karate classes, dance classes, and took her on frequent trips.

47. During the 18–month period [C.M.] was with the LaLondes, between the August 19th, 1994 incident and February 27th, 1996, the LaLondes sought the services of Dr. Luke Elliot, Ph.D., a clinical child psychologist from Lafayette, Louisiana.

48. Dr. Elliot testified by deposition in this matter, and stated that he saw no reason why there should not be grandparent visitation in this case, and that, in fact, he believed grandparent visitation would be in the best interests of [C.M.].

49. Dr. Elliot testified that he had an opinion regarding the reputation in the community of both Dr. [LaLonde] and [Grandmother], and he described that opinion as "excellent". He elaborated that [Grandmother] is very involved in church and civic activities. He further stated that, based on his observations of the LaLondes, together with their reputation in the community and the interactions between [Grandmother] and [C.M.], he saw no problems whatsoever with grandparent visitation. In fact, he thought it was a very healthy, life giving, and supportive relationship.

50. Both Boyd and [Grandmother] testified that they have been able to accept the fact that they have, once and for all, lost the custody battle over [C.M.], and they have come to accept the fact that Michael has now legally adopted [C.M.], and [C.M.] is legally Michael's child in every respect.

51. Boyd and [Grandmother] each testified that they were ready, willing, and able to bear all of the hardships of visitation between Indiana and Louisiana, and to be responsible for 100 percent of all associated expenses. The LaLondes testified that, if necessary, one of them would fly to Indiana in order to accompany one or both of the children on air travel back to Louisiana for extended visitation. They also testified that, if necessary, they would drive to Indiana to pick up the children and would be responsible for transporting them back to Indiana."

Record, pp. 230–233.

Based on these findings of fact, the trial court concluded that it was in the best interests of both C.M. and L.M. to have reasonable visitation with Grandmother because "[Grandmother] has had extensive and ongoing meaningful contact with [C.M.] since her birth and has attempted to have meaningful contact with [L.M.]." Record, p. 233. In so concluding, the trial court granted Grandmother weekly telephone visitation, four weeks of custodial visitation per year, and visitation on alternating holidays (Christmas, Thanksgiving, and Easter). The trial court also made Grandmother responsible for all expenses associated with transportation to facilitate the visitation.

From these findings and conclusions, it is apparent that, while clearly recognizing Grandmother's past misconduct, the trial court believed that Grandmother had abandoned her crusade for custody and would respect the orders giving full custody of the girls to Father. Although Father asserts that the trial court's findings on Grandmother's previous deceit does not support this conclusion, Father is essentially requesting that we judge Grandmother's credibility, which we cannot do. See DeHaan, 572 N.E.2d at 1320. Therefore, given the trial court's findings that Grandmother sincerely intends to forego any claims as to custody, we conclude that the trial court did not abuse its discretion in granting unsupervised visitation in Louisiana.

■ We further conclude that, as required by the statute, the trial court's findings support its conclusion that visitation with Grandmother is in the best interests of the children. Most importantly, the trial court found that Grandmother had "established a strong bond with [C.M.]" given that C.M. lived with Grandmother for a significant amount of time. Record, p. 231. Also, the child psychologist testified that he be-

**1282**

lieved that C.M. and Grandmother shared "a very healthy, life giving, and supportive relationship." Record, p. 232. We agree with Father's assertion that the relationship between grandchild and grandparent is not the sole factor to be considered. *See Daugherty v. Ritter*, 646 N.E.2d 66, 68 (Ind.Ct.App. 1995), *aff'd by* 652 N.E.2d 502 (Ind.1995) (holding that the focus on the relationship between the grandparent and the grandchild is the starting point, but whether visitation is in the best interests of the child which can only be determined by considering the totality of the circumstances). However, the trial court apparently considered other relevant matters.

Some of these additional considerations included the Grandmother's good reputation and involvement in the community and C.M.'s opportunity to participate in various recreational activities while staying with Grandmother. In light of these findings, we cannot conclude that the trial court's order granting Grandmother visitation in Louisiana is clearly erroneous or unsupported by the findings. *See DeHaan*, 572 N.E.2d at 1320. Consequently, we affirm the trial court's order granting visitation to Grandmother.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

HOFFMAN, Senior Judge, and SULLIVAN, J., concur.