


FILED

Mar 28 2024, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In the Matter of the Marriage of:

Sheena Reel (Mother),

*Appellant-Respondent*

v.

Joshua Reel (Father),

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian ad Litem.*

---

March 28, 2024

Court of Appeals Case No.
23A-DC-885

Appeal from the Marion Superior Court

The Honorable Marshelle Dawkins Broadwell, Special Judge
The Honorable Alicia A. Gooden, Judge

**Opinion by Judge Foley**
Judges Pyle and Tavitas concur.

**Foley, Judge.**

[1] Sheena Reel ("Mother") and Joshua Reel ("Father") are no longer married, but they share physical custody of their daughter E.R. ("Child"). Ahead of the COVID-19 pandemic, Father had primary physical custody. Father initiated contempt proceedings when, mid-pandemic, Mother refused to let Child return to Father's home. The trial court issued multiple orders attempting to enforce the prevailing custody order, and Father filed additional contempt allegations when Mother continued to disobey the order. Meanwhile, Mother unsuccessfully sought removal of the Guardian ad Litem ("GAL") on multiple occasions, alleging deficient performance. Mother also filed a petition to modify child custody, seeking primary physical custody. Moreover, both parents asked the trial court to award them attorney's fees related to the litigation. In the end, the trial court determined that Father should retain primary physical custody. The trial court also granted Father's request for

attorney's fees, denying Mother's competing request.[1]  Mother now appeals,

presenting three restated issues for our review:

> I.  Whether the trial court abused its discretion in denying her petition to modify custody;
>
> II.  Whether the trial court erred in declining to appoint a different GAL or in considering the GAL's report when ruling on Mother's petition to modify custody; and
>
> III.  Whether the trial court erred in awarding attorney's fees to Father.

We affirm.

## Facts and Procedural History

Mother's and Father's marriage was dissolved in 2014.  Later, Child was the

subject of post-dissolution proceedings that led to Father obtaining primary

physical custody in May 2019, at which point Child was approximately eight

years old.  When the COVID-19 pandemic emerged in early 2020, Child was

engaged in e-learning; Mother could work remotely, but Father had to work

outside the home to run his construction business.  Under the circumstances,

---

[1] The Honorable Marshelle Dawkins Broadwell presided over the evidentiary hearings regarding custody and attorney's fees, having been appointed as special judge in July 2022.  *See generally* Appellant's App. Vol. 2 pp. 46–47.  We quote from Judge Broadwell herein.  However, we also quote from The Honorable Alicia A. Gooden, who presided over earlier hearings regarding the GAL, parenting time, and allegations of contempt.

Mother and Father provisionally agreed that Child would reside with Mother, and Father would come to Mother's residence to exercise his parenting time.

[4] Child began residing with Mother in April 2020. By late August 2020, Father wanted to exercise parenting time in his home, but Mother refused to let Child leave with Father. On August 28, 2020, Father filed a petition for contempt and requested that Child be immediately returned to his care. *See* Appellant's App. Vol. 2 p. 17. A few days later, Mother filed a petition to modify the child custody order, requesting primary physical custody of Child. *See id.* at 107–08.

[5] In January 2021, Father asked the court to appoint Kids' Voice of Indiana ("Kids' Voice") as the GAL. The trial court held a hearing in early February 2021, addressing parenting time issues and the request for a GAL. The court issued an order on February 4. As for parenting time, the trial court decided to phase in Child's parenting time with Father, ordering that Father would have parenting time outside of Mother's presence on Wednesdays and Saturdays. *See* Tr. Vol. 2 p. 55. Regarding Father's GAL request, the trial court appointed Kids' Voice over Mother's objection. This led to Julie Camden serving as the GAL ("GAL Camden") through Kids' Voice. GAL Camden had served in this role for the family as recently as 2019, during other post-dissolution matters.

[6] After the trial court issued its order phasing in Father's parenting time, Father tried to retrieve Child on his designated days. However, Mother refused to let Child leave with Father. These events led Father to file an additional petition for contempt. On February 12, 2021, the trial court issued an order directing

that its February 4 order "st[ood]; parties shall comply in all respects; [and] further non-compliance may result in sanctions at a future hearing." Appellant's App. Vol. 2 p. 22. Mother still refused to comply, leading Father to file an additional contempt petition and ask the court to authorize the assistance of law enforcement to enforce the custody order. Father also sought contempt sanctions. At that point, the court declined to authorize the assistance of law enforcement. However, in connection with an order issued on February 18, the trial court said that it would "consider future sanctions if necessary." *Id.* at 22.

[7] On February 22, Father filed his third emergency motion for contempt. The trial court held a hearing on February 25. Regarding Mother's noncompliance with the parenting time order, the trial court stated: "Mother has been instructed that if the parenting time order isn't followed, or if law enforcement is necessary to assist in enforcing this Court's order, the [c]ourt will be inclined to issue sanctions." *Id.* at 25. Mother did not comply with the order, and by March 9, Father had filed his sixth emergency motion for contempt. The trial court scheduled an emergency hearing for March 18, 2021. Ahead of that hearing, Mother filed a motion requesting the appointment of a different GAL. At the hearing, the trial court declined to replace GAL Camden, stating: "I think it would be detrimental to [Child] to change [the GAL]." Tr. Vol. 2 p. 46. The court also engaged in a colloquy with Mother regarding parenting time:

> THE COURT: So, let me interrupt you. The Wednesdays and Saturdays that I have set forth in my order, has [Father] been able to take [Child] out of your care, out of your sight[,] . . . out

|  |  |
|---|---|
|  | of your presence as my February 4th order has set forth? |
| [MOTHER]: | No, I – |
| THE COURT: | It's a very simple answer. |
| [MOTHER]: | No, I feel those orders are dangerous. |
| THE COURT: | I appreciate your opinion, but you've not complied with them, correct? |
| [MOTHER]: | They're posing a risk to my daughter, Your Honor. |

*Id.* at 55. The trial court then discussed Mother's refusal to comply with the order on custody, noting that "the absolute refusal to follow an order [was] something that [the court had] not seen." *Id.* at 57. The court referred to the Family Law Task Force the Indiana Supreme Court had established—to which the judge was appointed—that "ha[d] put forth a number of recommendations and guidance . . . in light of COVID." *Id.* The court stated: "One of the things that [the Family Law Task Force] ha[s] said repeatedly, the Supreme Court and the Task Force itself[,] is that the presence of COVID-19 as a pandemic, as a disease[,] does not suspend or change parenting time or custody orders." *Id.* The court added: "The Indiana Supreme Court and the Family Law Task Force do[] not make a distinction on a household member when they're a member of the family, whether that's a custodial or a noncustodial parent." *Id.* at 58.

[8]     The trial court acknowledged that Mother's and Father's decision in the early days of the pandemic "did make some sense based on the fact that there was certainly a lot unknown, a lot uncertain," especially in "[t]hat father had a company to run . . . at a time when lots of people that own their own businesses, lawyers included, weren't sure if the next paycheck was going to come." *Id.* The trial court added that, although it "d[id not] take issue with [M]other or anybody else with respect to how this [interim custody arrangement] initially came to be," the court "d[id] take issue . . . [because] [M]other ha[d] now manipulated the situation to her advantage [in that] instead of [the custody arrangement] being a couple of months or a few months, or a few weeks, it's now been a year." *Id.* The trial court rejected "the argument on behalf of [M]other . . . that [r]ipping [Child] from [her] would be, you know, trauma to [C]hild." *Id.* at 58–59. The trial court noted that it was "clear . . . that [F]ather wanted to have [Child] back in his home" at least "six months ago, and [M]other cannot now come back and . . . use all of this to her benefit when she is the culprit of continuingly ensuring that [Child] doesn't have any time or relationship with [F]ather." *Id.* at 59. The trial court added that Mother had presented "zero medical evidence about harm or risk, or safety to [Child]." *Id.* The trial court also determined that Mother had fostered circumstances that "led to an unbalanced and a one-sided view of COVID for [Child]," adding: "What [Mother] has been doing and has been allowed to do to [Child] this court finds is one hundred percent . . . emotionally abusive." *Id.*

[9]     The trial court noted that Mother had "completely ignored" its February 4 order, then ignored subsequent orders, despite the court going "so far as telling [M]other on February 25 . . . that if [the court[ had to get law enforcement involved, it was really not going to be a good thing for her." *Id.* at 61. Based on Mother's decision not to comply with the orders on parenting time, the trial court explained that it had "zero choice"—"[n]ot one"—in that Mother had "taken matters into her own hands" and "played judge . . . essentially" in that she "dictated what [Father] can and cannot do" with Child. *Id.* The trial court stated that it was "not fearful of incarcerating a parent for [the] failure to follow [its] orders," and "ha[d] an inclination" to order Mother's incarceration for her "willful failure to comply with [its] orders." *Id.* at 61. The court indicated that a written order would be forthcoming, but that it would orally go over the order. Before going over the order, the court added that it was "extremely concerned about the emotional well-being of [Child]," noting that its "belie[f] that[,] if th[e] order [was] not issued and acted upon immediately, . . . the court w[ould] be continuing to contribute to [the] emotional damage[.]" *Id.* at 63.

[10]    In its written order, the trial court "note[d] that the Order of May 2019 [that] provided primary physical custody to Father ha[d] never been rescinded, modified[,] or vacated." Appellant's App. Vol. 2 p. 103. The court stated that its "May 2019 order granting Father primary physical custody of [Child] shall be in full force and effect," noting that the order was "in [Child's] best interests." *Id.* Regarding physical custody, the trial court stated: "Father shall be entitled to retrieve [Child] from Mother's home IMMEDIATELY and any

and all law enforcement agencies shall assist if necessary." *Id.* The trial court also found that "Mother's actions of thwarting Father's time and relationship with [Child], her insistence on restricting Father's time with the unfounded rationale of [Child's] health, and her absolute refusal to follow th[e] [c]ourt's orders [were] emotionally damaging to [Child]." *Id.* The trial court further found that "unsupervised time between Mother and [Child] would significantly impair [Child's] emotional development." *Id.* The trial court added that it was "immensely fearful of the damage that has already been done" to Child. *Id.*

[11] The trial court ultimately ordered that Mother would "have supervised parenting time with [Child], by an outside and neutral supervisor, once per week for 3 hours until further order." *Id.* The trial court further ordered that Father "immediately have [Child] in individual counseling," and directed Mother to "immediately engage in individual therapy," specifying that Mother must provide her therapist with "[a]ll order[s] issued since May of 2019[.]" *Id.* The trial court added that it was "maintain[ing] its current orders regarding the GAL[.]" *Id.* As for Father's request for sanctions, the court said it was taking the request under advisement, deferring any other remedies for a future hearing.

[12] After the hearing, Father tried to pick up Child from Mother's home. Mother told Father to leave her property. Eventually, Father was able to leave with Child, but only after law enforcement responded to the home and a representative from the Department of Child Services ("DCS") went inside. In the wake of the protracted exchange, Father filed another contempt petition. Shortly thereafter, Mother moved to immediately modify the custody order.

[13]    In the intervening months, an additional hearing was held, and Mother again unsuccessfully moved for the replacement of GAL Camden as the GAL. Eventually, the trial court held an evidentiary hearing and issued a March 2023 "Order [O]n All Pending Motions Related to Custody and Parenting Time," accompanying the order with sua sponte findings and conclusions. *Id.* at 65. Regarding its provisional custody order, the trial court found "that there ha[d] been a significant and continuing change that render[ed] the current order unreasonable, such that slight modifications to the current order are necessary." *Id.* at 72. However, the court noted that it "d[id] not find that custody should be modified to Mother." *Id.* Rather, the trial court determined that "Father shall exercise primary physical custody" and that Mother generally "shall exercise reasonable parenting time" under the Indiana Parenting Time Guidelines, but with "no opportunity for additional parenting time." *Id.* at 73. The trial court directed that Child remain in therapy, so long as Child's therapist continued to recommend those therapeutic services. As to Mother, the trial court specifically found that, although "Mother loves and cares about Child," Mother's "behavior toward Father and her parenting style have been damaging to Child, resulting in alienation between Child and Father." *Id.* at 69. The trial court further found that "Mother ha[d] made limited attempts to correct her behavior through work with mental health professionals." *Id.* at 70.

[14]    In its written order, the trial court discussed the GAL, noting that GAL Camden engaged in an "extensive investigation" and had "an extended period of involvement" in the case." *Id.* The trial court specifically found that the

GAL's "investigation and . . . reports [were] professional, appropriate[,] and helpful to the [c]ourt." *Id.* at 69. The trial court further found that the GAL "conducted a thorough investigation, focused on the best interests of Child." *Id.* The court observed that GAL Camden "appeared frustrated at times during her testimony." *Id.* The trial court added the following remarks: "The GAL volunteered over 100 hours in this cause and was treated in a remarkably disrespectful manner by Mother's counsel. However, the [c]ourt does not find the GAL to have been unfair, biased[,] or uneven with the parties." *Id.*

[15] Regarding Mother's various pending motions, which included contempt allegations, the court said: "The [c]ourt finds that each of Mother's pending motions is without merit. The [c]ourt does not find Father in contempt, and does not find that Mother is entitled to any make-up parenting time." *Id.* at 74. As to Mother, the court found that she "filed multiple meritless motions and petitions, requesting the [c]ourt, without justification, to reconsider and re-open settled matters." *Id.* at 75. The court further found "Mother in contempt for her willful failure to comply with the [c]ourt's prior orders regarding parenting time," and determined that "Mother ha[d] caused Father to incur extraordinary attorney['s] fees as a result of her contemptuous actions." *Id.* The court said it would be scheduling a hearing regarding "the issuance of attorney['s] fees." *Id.*

[16] The trial court held a hearing on May 15, 2023 "with regard to each party's request for attorney's fees." *Id.* at 76. After "find[ing] that Mother's request that Father pay any portion of [her] attorney['s] fees [was] without merit," the trial court found that "Father's request that Mother pay $78,986.50 of Father's

fees [was] reasonable." *Id.* The trial court referred to its March 2023 order, wherein it found that Mother "ha[d] engaged in a remarkably sustained pattern of frivolous filings, wasted court time, and contempt of court [that] has resulted in the extraordinarily high attorney[']s fees generated in this cause." *Id.* The trial court rejected Mother's contention that "she should not have to pay Father's fees, and that Father should have to pay her fees[,] because Father makes more money than Mother." *Id.* The court noted that (1) Mother "makes approximately $140,000 per year," (2) the evidence indicated that Father's income was in excess of $300,000 per year, (3) "[e]ach party is capable of paying for their own regular attorney's fees," and (4) "each party is capable of paying for . . . frivolous litigation and contemptuous behavior." *Id.* at 77. Regarding "frivolous litigation and contemptuous behavior," the trial court added: "Mother wrongfully caused Father to incur fees related to Mother's violation of this [c]ourt's orders and admonishments on custody. Mother caused Father to defend against meritless motions on multiple occasions." *Id.* The trial court ultimately ordered Mother to "pay Father's reasonable attorney[']s fees of $78,986.50 in four quarterly installments" of $19,746.50, with the first installment due on September 1, 2023. *Id.* Mother now appeals.

## Discussion and Decision

### I.  Custody Determination

[17]  Mother challenges the denial of her petition to modify child custody in her favor. She contends that the trial court's custody determination was improperly "based on procedural defects and insufficient evidence[.]" Appellant's Br. p. 6.

[18] Indiana Code Section 31-17-2-21 governs a trial court's authority to modify child custody, specifying that modification is proper only if it is in the child's best interests and there is a substantial change in "one . . . or more of the factors" set forth in Indiana Code Section 31-17-2-8.  That statute sets forth a non-exhaustive list of factors that bear on a child's best interests, including:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and
>>
>> (C) community.

(6) The mental and physical health of all individuals involved.

Ind. Code § 31-17-2-8.

[19] In general, we review custody decisions for an abuse of discretion, "with a 'preference for granting latitude and deference to our trial judges in family law matters.'" *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993)); *see also In re Paternity of J.T.*, 988 N.E.2d 398, 400 (Ind. Ct. App. 2013) (observing that "the trial court is not, absent a request by a party, required to make special findings" pursuant to Trial Rule 52). A trial court abuses its discretion if its decision is "clearly against the logic and effect of the facts and circumstances before it or where the trial court errs on a matter of law." *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013). However, where—as here—the trial court entered sua sponte findings covering the issue of child custody, we review those findings under Trial Rule 52. Under this rule, we "shall not set aside the findings or judgment unless clearly erroneous," and we give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52; *see also, e.g.*, *Perkinson*, 989 N.E.2d at 761 ("Judgments in custody matters typically turn on the facts and will be set aside only when they are clearly erroneous."). Under this standard, we do not reweigh the evidence. *See Kirk*, 770 N.E.2d at 307. Moreover, we will affirm the trial court's custody determination so long as "any evidence or legitimate inferences support the trial court's judgment." *Id.* Furthermore, the parent seeking modification of a child custody order "bears the burden of demonstrating the existing custody should be altered." *Id.*

Mother argues that the trial court's custody decision was contrary to Child's best interests. In so arguing, Mother focuses on the following finding: "The [c]ourt does not have any concerns regarding Father's mental health, physical health, or alleged anger issues pertaining to Father's ability to parent child[.]" Appellant's App. p. 68. According to Mother, the "finding that Father's mental health doesn't affect his ability to parent . . . is a finding that lacks evidentiary support." Appellant's Br. p. 38. Mother ultimately argues that the trial court "failed to take proper consideration of Father's behavior as it relates to his ability to care for [Child]." *Id.* at 34. Mother characterizes Father as unstable, suggesting that the trial court overlooked a range of evidence that "strongly suggest[ed]" that Father "has mental health issues affecting his ability to act as a primary custodian," and those issues were "not appropriately being addressed." *Id.* at 40. Mother directs us to specific evidence in her briefing. *See id.* at 38–40. In particular, she expresses concern about Father's relationship with alcohol, noting that she "believed Father consumed alcohol while taking his prescribed medications." *Id.* at 39. Mother also points out that she "voiced concern for the lack of stability in Father's home due to Father having dated several women during this . . . post-dissolution action[.]" *Id.* at 40. Mother asserts that, because Father "dat[ed] and socializ[ed]" with specific women, Child "was forced to stay in unfamiliar environments with persons she had not established bonded relationships with." *Id.* (referring to Father's relationships with "Kim, Christina, Taylor, Ashley, Sarah, Tiffany, and Jacqueline").

In short, Mother focuses on the evidence that is least favorable to the trial court's ruling. *See id.* at 38–40. Yet, Mother declines to address the trial court's detailed findings related to the detrimental impact of Mother's approach to parenting, including findings that (1) "Mother's behavior toward Father and her parenting style have been damaging to Child, resulting in alienation between Child and Father" and, as of the fact-finding hearing, (2) "Mother ha[d] made limited attempts to correct her behavior through work with mental health professionals." Appellant's App. Vol. 2 pp. 69–70. We must decline Mother's request to reweigh evidence bearing on Child's best interests. The court properly considered Mother's arguments and evidence but chose to retain primary custody with Father due to its overriding concerns related to Mother.

Ultimately, when it comes to child custody, "[o]n appeal, it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by [the] appellant before there is a basis for reversal." *Kirk*, 770 N.E.2d at 307 (first alteration in original) (quoting *Brickley v. Brickley*, 210 N.E.2d 850, 852 (Ind. 1965)). Having reviewed Mother's arguments, we conclude that the trial court's custody decision has sufficient evidentiary support. We are therefore unpersuaded that the trial court clearly erred in denying Mother's petition to modify child custody in her favor.

## II. The GAL

Mother argues that the trial court erred in denying her requests to remove GAL Camden and appoint a different GAL. According to Mother, the GAL "was failing (or possibly refusing) to perform her duties as a GAL[.]" Appellant's Br.

p. 42. Mother asserts that, because of this allegedly deficient performance, the trial court abused its discretion in declining to remove the GAL, and the trial court erred to the extent that it relied on the GAL's report. *See id.* at 41–46.

[24] Under Indiana Code Section 31-9-2-50, a GAL is a person "appointed by a court" to "represent and protect the best interests of a child" and "provide the child with services requested by the court[.]" Those services include "(A) researching; (B) examining; (C) advocating; (D) facilitating; and (E) monitoring" the child's "situation" during litigation. I.C. § 31-9-2-50(a)(2). Indiana Code Chapter 31-17-6 governs the appointment of a GAL in post-dissolution proceedings. Under these statutes, the trial court "may appoint a [GAL] . . . for a child at any time," and the GAL "serves until the court enters an order for removal." I.C. §§ 31-17-6-1, -3. When appointed, the role of the GAL is to "represent and protect the best interests of the child." I.C. § 31-17-6-3. Moreover, in carrying out this function as a court appointee, the GAL is "considered [an] officer[] of the court[.]" I.C. § 31-17-6-4. In general, our trial courts have wide latitude in seeking the service of a GAL. That is, even after the trial court has made a custody decision, the court may "order a [GAL] . . . to exercise continuing supervision over the child" to ensure that the terms of the court's custody order "are carried out as required by the court." I.C. § 31-17-6-7. Similarly, independent of the GAL statutes, our legislature gave trial courts wide latitude to "seek the advice of professional personnel" in making custody determinations, so long as "[t]he advice . . . [is] given in writing and made available by the court to counsel upon request." I.C. § 31-17-2-10. Of course,

the court "is not required to accept the opinions of experts regarding custody." *See Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000). Rather, the court has broad discretion as the decisionmaker in these types of cases. *See id.*

[25] Mother's appellate claims turn on whether the GAL's performance was deficient. However, rather than focus on whether the GAL report failed to meet the statutory requirements, Mother essentially argues that the GAL should have been removed because additional investigative work could have been performed. On appeal, the GAL disputes Mother's allegations that her performance was deficient, arguing that the GAL's "many actions during the course of these proceedings fit into one or more of the[] statutory duties" for a GAL, "and the trial court clearly recognized the valuable service she had performed for [Child]." GAL Br. p. 15. The GAL directs us to the trial court's findings "with respect to the GAL and her work," pointing out that the court specifically found that "the GAL's investigation and reports were 'professional, appropriate[,] and helpful' to the trial court and that her investigation was thorough and focused on [Child's] best interests." *Id.* at 14 (quoting Appellant's App. Vol. II p. 69). The GAL also directs us to the finding "that the . . . GAL was not in any way unfair, biased, or uneven with respect to the parties." *Id.* The GAL ultimately argues that Mother's "arguments on this topic are merely requests to reweigh the evidence, which this [c]ourt will not do." *Id.* at 23.

[26] We agree with the GAL. Although Mother maintains that the GAL's performance was deficient, the GAL was serving as an officer of the trial court, which was in the best position to determine the value of the GAL's volunteer

service on this case.  And to the extent Mother argues that the GAL failed to investigate certain things about Father, Mother was free to present that evidence to the trial court.  Mother was also free to cross-examine the GAL as to what matters Mother viewed to be insufficiently addressed.  *Cf. Clark*, 725 N.E.2d at 109 (indicating that the trial court is "not required to accept" the GAL's opinions).  In sum, it may well be that any GAL could have done more.  But Mother has failed to demonstrate that the GAL failed to meet her statutory duties or that the trial court's denial of Mother's request to remove the GAL was an abuse of discretion.  We therefore discern no proper basis for reversal based on the ongoing appointment of the GAL, the GAL's execution of her statutory duties, or the trial court's reliance upon the GAL report.

## III.  Attorney's Fees

[27]     Mother challenges the trial court's decision to grant Father's request for attorney's fees.  On appeal, Mother at times frames the issue as whether the fee award amounted to an improper contempt sanction.  However, independent of the contempt power, Indiana Code Section 31-17-7-1 ("the Fee Statute") applies in all post-dissolution cases.  Under the Fee Statute, trial courts have the discretionary power to "periodically . . . order a party to pay a reasonable amount for the cost to the other party of maintaining or defending" the action, "and for attorney's fees and mediation services[.]"  We therefore need not address Mother's appellate arguments exclusively focusing on the scope of the

contempt power. We focus instead on the Fee Statute, which allows the award of attorney's fees in post-dissolution cases—even in the absence of misconduct.[2]

[28] To award attorney's fees under the Fee Statute, the trial court "must consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn adequate income, and any other factors bearing on the reasonableness of the award." *Montgomery v. Montgomery*, 59 N.E.3d 343, 354 (Ind. Ct. App. 2016), *trans. denied*. Moreover, in awarding attorney's fees under the Fee Statute, the trial court may properly consider "[m]isconduct that directly results in additional litigation expenses[.]" *Id.* (quoting *Allen v. Proksch*, 832 N.E.2d 1080, 1102 (Ind. Ct. App. 2005)). Misconduct supporting a fee award need not rise to the level of contempt. *Cf. Carrasco v. Grubb*, 824 N.E.2d 705, 712 (Ind. Ct. App. 2005), *trans. denied*. Rather, a fee award is justified if the trial court could "reasonably conclude that the motions [one party] filed were frivolous and unreasonable" under the circumstances. *Id.*

[29] We review a challenge to the award of attorney's fees under the Fee Statute for an abuse of the trial court's discretion, which occurs if the decision was "clearly against the logic and effect of the facts and circumstances before the court." *Allen*, 832 N.E.2d at 1102. In applying this deferential standard of review, we

---

[2] Thus, for example, we do not address Mother's arguments seeking a "breakdown or indication of how Father's attorney's fees were allocated between contempt and non-contempt issues." Appellant's Br. p. 14.

do not reweigh the evidence; instead, our role is to consider the evidence in a light most favorable to the judgment. *Cf. Carrasco*, 824 N.E.2d at 712.

[30] Here, the trial court held a hearing on attorney's fees, where evidence was presented regarding—among other things—Mother's and Father's financial resources. Mother does not challenge the adequacy of the evidentiary presentation. Rather, in challenging the fee award, Mother invites us to reweigh the evidence. For example, Mother argues that "the evidence clearly showed Father's economic superiority and ability to pay his attorney's fees was exponentially greater[.]" *Id.* (citing Tr. Vol. 4 pp. 241, 246–48). We note, however, that the economic condition of the parties is only one factor bearing on the reasonableness of a fee award. *See Montgomery*, 59 N.E.3d at 354. Here, the court explained it was awarding attorney's fees, in part, because "Mother ha[d] engaged in a remarkably sustained pattern of frivolous filings, wasted court time, and contempt of court [that] has resulted in the extraordinarily high attorney[']s fees generated in this cause." Appellant's App. Vol. 2 p. 76. Next, Mother argues that the fee award was improper because Father "contributed to the excessive litigation . . . [by] filing over twenty-five (25) motions and pleadings between August 28, 2020, and April 21, 2023." Appellant's Br. p. 14. However, as Father points out, many of those filings were prompted by Mother's misconduct in flouting not only the 2019 custody order, but also subsequent orders directing Mother to comply with the 2019 custody order. *See generally* Appellee's Br. pp. 21–22. Mother devotes limited briefing to the fact that Father's filings were typically responses to her misconduct. Rather, at one

point she argues Father's filings were excessive because "eight (8) contempt filings . . . contained recitation of prior contempt pleadings."  Appellant's Reply Br. p. 12.[3]

[31]   All in all, Mother has not persuaded us that the trial court abused its discretion in imposing the attorney's fees under the Fee Statute.  *See* I.C. § 31-17-7-1 (permitting an award of attorney's fees in post-dissolution matters, even without parental misconduct); *see also Carrasco*, 824 N.E.2d at 712 (identifying no error in the fee award because of evidence of parental misconduct that did involve a contempt finding, noting that, in that case, "the trial court could reasonably conclude that the motions [the parent] filed were frivolous and unreasonable").

## Conclusion

[32]   We discern no basis for reversal related to the trial court's (1) denial of Mother's petition to modify custody in her favor, (2) handling of issues related to the GAL, or (3) decision to award Father attorney's fees under the Fee Statute.

[33]   Affirmed.

---

[3] At one point, Mother asserts—without citation—that "[t]he payment obligation of paying the entire . . . award in four . . . installments is unduly burdensome on Mother[,] whose income and expenses make said obligation an extreme hardship.  Alternative remedies or sanctions would have been more appropriate." Appellant's Br. p. 52.  Yet, Mother does not develop this argument, ultimately declining to propose an alternative payment structure.  *See, e.g.*, Appellant's Reply Br. p. 14 (asserting only that "[t]he deadline and payment schedule . . . is unreasonable").  Under the circumstances, we conclude that Mother has waived this appellate issue.  *See* App. R. 46(A)(8)(a) (directing the appellant to support each contention with "cogent reasoning").

Pyle, J., Tavitas, J., concur.

ATTORNEYS FOR APPELLANT

Carl Paul Lamb
Matthew Fox
Carl Lamb & Associates, PC
Bloomington, Indiana

ATTORNEY FOR APPELLEE FATHER

DawnMarie White
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE KIDS' VOICE OF INDIANA

Katherine Meger Kelsey
Chief Legal Counsel
Indianapolis, Indiana